IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on June 14, 2024

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | VIOLATIONS: |
| | : | |
| JOSE BIAOU, | : | 18 U.S.C. § 1343 (Wire Fraud); |
| | : | 18 U.S.C. § 641 (Theft of Government |
| Defendant. | : | Property); |
| | : | 18 U.S.C. §§ 981(a)(1)(C), 982(a)(2)(A); |
| | : | 21 U.S.C. § 853(p); 28 U.S.C. § 2461(c) |
| | : | (Criminal Forfeiture). |
| | : | |
| | : | |

**INDICTMENT**

The Grand Jury charges that, on or about the times and dates stated herein:

**Introduction**

At all times relevant to this Indictment:

*The Defendant and Relevant Entities*

1. Defendant **JOSE BIAOU** ("**BIAOU**") is a citizen of Benin and current resident of Washington, D.C.

2. **BIAOU** was the Chief Executive Officer of FRB Capital Group LLC d/b/a FRB Realty Capital (hereinafter, "FRB"), a D.C. Limited Liability Corporation formed by **BIAOU** in D.C. on September 4, 2013, and controlled by **BIAOU**. The purpose of FRB was to broker loans between financial institutions and investors on the one hand and commercial developers on the other.

3. **BIAOU** maintained business checking accounts on behalf of FRB at JP Morgan Chase & Co. ("JP Morgan") ending in 3070 and at PNC Bank ("PNC") ending in 1469.

4. JP Morgan and PNC were participating lenders under the Paycheck Protection Program ("PPP"), as described below. The United States Small Business Administration ("SBA") was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses and administered the PPP.

### *The Small Business Administration*

5. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. The SBA is located at 409 3rd Street, Southwest in Washington, D.C.

### *The Paycheck Protection Program*

6. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of billions of dollars in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP.

7. To obtain a PPP loan, a qualifying business must have submitted a PPP loan application, signed by an authorized representative of the business. The applicant of a PPP loan was required to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the applicant was required to state, among other things, its: (a) average monthly payroll expenses and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan must have provided documentation showing their payroll expenses. To qualify for eligibility, businesses that applied for a PPP loan needed to

be in operation as of February 15, 2020. The applicant was also required to certify that all the information in the application was true and correct.

8. PPP loan applications were processed by a participating financial institution (the lender). If a PPP loan application was approved, the participating financial institution funded the PPP loan using its own monies, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

9. PPP loan proceeds were required to be used by the applicant business for certain permissible expenses, including payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses.

10. In or around December 27, 2020, the Economic Aid to Hard-Hit Small Business, Nonprofits and Venues Act provided additional funding for the PPP and extended the application deadline to March 31, 2021. The act enabled borrowers to take a second draw PPP loan under the same general terms as their first PPP loan up to a maximum loan amount of $2 million. The act reopened the program to borrowers who did not previously receive a first draw PPP loan. To be eligible for a second draw, borrowers were required to employ no more than 300 employees, demonstrate a 25% reduction in gross receipts during a calendar quarter in 2020, and have expended the full amount of their initial PPP loan. Allowable expenses were expanded to include worker protection costs related to COVID-19, uninsured property damage costs caused by looting or vandalism during 2020, and certain supplier costs and expenses for operations. The expansion applied retroactively to first draw PPP loans that had not been forgiven by the SBA.

11. In or around March 25, 2021, the PPP Extension Act of 2021 extended the application deadline from March 31, 2021 to May 31, 2021. In addition to extending the PPP application filing window by 60 days, the Extension Act provided an extra 30 days for the SBA to finish processing applications received by the May 31, 2021 deadline.

### *The Economic Injury Disaster Loan Program*

12. The Economic Injury Disaster Loan ("EIDL") program was a disaster relief program administered by the SBA that predated the COVID-19 pandemic. Small business owners and non-profit organizations in all U.S. states, the District of Columbia, and U.S. territories could apply for an EIDL. EIDLs were designed to provide economic relief to businesses that were experiencing a temporary loss of revenue due to a disaster. EIDL proceeds were not intended to replace lost sales or profits or for expansion of a business. Unlike certain other types of SBA-guaranteed loans, EIDL funds were issued directly from the United States Treasury, and applicants applied through the SBA via an online portal and application.

13. To obtain an EIDL, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was the year preceding January 31, 2020. The applicant was also required to certify that all the information in the application was true, correct, and complete, and agree in the required Loan Authorization and Agreement that the EIDL funds would be used solely as working capital to alleviate economic injury caused by disaster. The applicant was warned that any false statement or misrepresentation to the SBA or any misapplication of loan proceeds might result in sanctions, including criminal penalties.

14. The amount of an EIDL, if the application was approved, was determined based, in part, on the information provided in the application about employment, revenue, and cost of goods, as set forth above. Any funds issued under an EIDL were issued directly by the SBA. EIDL funds were required to be used as working capital, such as payroll expenses, sick leave, production costs, and ordinary business obligations, such as debts, rent, and mortgage payments.

## COUNTS ONE THROUGH SIX
(Wire Fraud)

15. Paragraphs 1 through 14 are realleged.

### The Scheme to Defraud

16. Beginning in at least April 2020, and continuing through at least December 2022, in the District of Columbia and elsewhere, the defendant, **JOSE BIAOU,** knowingly devised, intended to devise, and participated in a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, that is, **BIAOU** submitted and caused to be submitted three PPP loan applications and two EIDL applications that contained false and fraudulent representations and obtained loans as a result of those false and fraudulent representations.

### Purpose of the Scheme to Defraud

17. It was a purpose of the scheme to defraud that **JOSE BIAOU** would enrich himself by obtaining PPP and EIDL funds that he was not entitled to receive.

### Manner and Means of Scheme to Defraud

It was part of the scheme to defraud that:

#### *FRB's First PPP Application*

18. On April 9, 2020, **BIAOU** submitted an application to JP Morgan on behalf of FRB containing false information, seeking to obtain over $225,0000 in PPP loan money.

19. In that application, **BIAOU**, claimed that FRB had seven employees with an average monthly payroll of $90,000, when in fact, FRB had one full-time employee and two independent contractors, who, during the entire year, made approximately a *combined* $140,000, with an average monthly payroll of approximately $11,700.

20. **BIAOU** included in his application a payroll summary purporting to be from FRB's payroll service provider Gusto, Inc. ("Gusto"), that was not, in fact, consistent with Gusto's records for FRB. Namely, the paperwork listed seven employees for each month of the calendar year and indicated that for every month, the seven employees were paid almost $90,000 in wages per month, when again, only three employees received wages from FRB during 2019.

21. Based on the false representations, JP Morgan approved **BIAOU**'s application and electronically transferred $225,000 in loan proceeds into **BIAOU**'s JP Morgan account ending in 3070.

### *Forgiveness of First PPP Loan*

22. On December 1, 2022, BIAOU submitted a false application on behalf of FRB to JP Morgan for forgiveness of the initial $225,000 loan.

23. In support of that application, **BIAOU** made misrepresentations about FRB's purported rent payments to its landlord. Specifically, **BIAOU** submitted a record of payments reflecting a monthly rent of $13,827, as well as six checks purporting to be rent checks issued from FRB's business checking account at TD Bank, as well as a signed copy of a second supplemental lease agreement entered into by **BIAOU** and his landlord memorializing the schedule of monthly base rent. The signed lease agreement was fraudulent, with **BIAOU** having forged or caused to be forged the signatures. The checks were also fraudulent, and the actual monthly rent payments

made to the landlord were each $10,000 less than the $13,827 **BIAOU** fraudulently represented on his forgiveness application.

### *FRB Second PPP Application*

24. On February 17, 2021, **BIAOU** submitted on behalf of FRB a fraudulent loan application to PNC, a financial institution, to obtain $222,500 in a second PPP loan.

25. In support of that application, **BIAOU** made the false and fraudulent claim that FRB employed ten employees, when in fact FRB employed only between one and two salaried employees, and **BIAOU** also falsely claimed that FRB had an average monthly payroll of approximately $89,900, when according to FRB's tax returns, between the two employees, the average monthly payroll was approximately $8,500.

26. In support of that application, **BIAOU** caused the submission of false and fraudulent payroll records purporting to be from Gusto, which remained FRB's payroll service provider at that time. The payroll records **BIAOU** submitted suggested FRB employed ten individuals and had average monthly payroll costs associated with them. These documents were fraudulent because the information contained in them did not in fact come from Gusto or match Gusto's records for FRB.

27. **BIAOU**, upon approval of his application, caused PNC to electronically transfer $222,500 in loan proceeds into BIAOU's PNC account ending in 1346.

### *Millenium Global Finance PPP Application*

28. On March 25, 2021, **BIAOU** submitted on behalf of Millenium Global Finance a fraudulent loan application to PNC, a financial institution, to obtain over $1,250,000 in PPP loan money.

29. In support of that application, **BIAOU** falsely certified that Millenium Global Finance was in operation on February 15, 2020, and "had employees for whom it paid salaries and payroll taxes

or paid independent contractors, as reported on Form(s) 1099-MISC." In fact, Millenium Global Finance had neither employees, nor paid independent contractors, nor any revenue. **BIAOU** also falsely certified that "current economic uncertainty makes [the] loan request necessary to support the ongoing operations of the Applicant."

30. Additionally, in that application, **BIAOU** falsely claimed that Millenium Global Finance was an eligible company, with 52 employees in 2019 and average monthly payroll costs of $523,452.67. In fact, Millenium Global Finance was not even in operation at the time.

31. In support of the application, **BIAOU** also submitted a false and fraudulent payroll summary purporting to be from Millenium's payroll service provider ADP, which ADP later confirmed was not genuine.

32. **BIAOU**, upon approval of his application, caused PNC to electronically transfer $1,250,000 in loan proceeds into **BIAOU's** PNC account ending in 1346.

### *FRB EIDL Application*

33. On August 16, 2021, **BIAOU** submitted on behalf of FRB a fraudulent loan application to SBA, to obtain $1,877,600 in EIDL proceeds.

34. In support of that application, **BIAOU** falsely claimed that he was a U.S. citizen and provided supporting documentation in the form of a Certificate of Live Birth purporting to be from the D.C. Department of Health, which the D.C. Vital Records Registrar has confirmed to be fraudulent.

35. In support of that application, **BIAOU** caused to be made the false and fraudulent claims that FRB employed seven employees as of January 2020, and earned $2,250,000 in gross revenue in 2019, when, in fact, as of January 2020, FRB had one employee and earned approximately $938,000 in gross revenue in the year prior, according to its tax returns.

36. **BIAOU**, upon approval of his application, caused SBA to electronically transfer $1,877,500 in loan proceeds from a U.S. Treasury account into **BIAOU**'s account with TD Bank ending in 0674.

*Millenium Global Finance EIDL Application*

37. On or about December 27, 2021, **BIAOU**, submitted a fraudulent loan application on behalf of Millenium Global Finance to obtain $2,000,000.

38. In support of that application, **BIAOU** caused to be made the false and fraudulent claim that he was a U.S. citizen and that Millenium Global Finance had 22 employees as of January 2020 and 12 employees as of the time of the application's submission.

39. SBA later rejected the application, and no funds were ever electronically transferred to the account designated by **BIAOU**.

## The Charges

40. On or about the dates set forth below, in the District of Columbia and elsewhere, the defendant,

**JOSE BIAOU,**

for the purpose of executing and attempting to execute the scheme to defraud described above, transmitted and caused to be transmitted by means of wire communication in interstate commerce, the following writings, signs, signals, pictures, and sounds:

| Count | Approximate Date | Description |
|---|---|---|
| 1 | April 9, 2020 | An interstate wire signal originating from Jose Biaou, in the District of Columbia, to J.P. Morgan Chase containing a false and fraudulent PPP loan application for $225,000 |
| 2 | February 17, 2021 | An interstate wire signal originating from Jose Biaou, in the District of Columbia, to PNC Bank containing a false and fraudulent PPP loan application for $222,500 |
| 3 | March 25, 2021 | A foreign wire signal originating from Jose Biaou, in Benin, to PNC Bank containing a false and fraudulent PPP loan application for $1,250,000 |
| 4 | August 16, 2021 | A foreign wire signal originating from Jose Biaou, in Turkey, to SBA containing a false and fraudulent EIDL application for $1,877,600 |
| 5 | December 27, 2021 | An interstate wire signal originating from Jose Biaou, in the District of Columbia, to SBA, containing a false and fraudulent EIDL application for $2,000,000 |
| 6 | December 1, 2022 | An interstate wire signal originating from Jose Biaou, in the District of Columbia, to JP Morgan Chase containing a false and fraudulent application to forgive the first PPP loan of $225,000 |

(Wire Fraud, in violation of Title 18, United States Code, Section 1343).

## COUNT SEVEN
### (THEFT OF GOVERNMENT PROPERTY)

41. Paragraphs 1 through 14 and 33-36 are realleged.

42. In or around August 2021, in the District of Columbia and elsewhere, the defendant,

## JOSE BIAOU,

did willfully and knowingly steal, purloin, and convert to his use and the use of another, any money and thing of value of the United States and any department and agency thereof, with an aggregate value that exceeded $1,000, that is, $1,877,500 in EIDL funds paid as a result of EIDL Application No. 3323201312, submitted under the business name "FRB Realty."

**(Theft of Government Property, in violation of Title 18, United States Code, Section 641).**

## NOTICE OF FORFEITURE

The allegations contained in Counts One through Seven of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

Upon conviction of the offense(s) in violation of Title 18, United States Code, Section 1343, as set forth in Counts One through Six of this Indictment, or Title 18, United States Code, Section 641, as set forth in Count Seven of this Indictment, the defendant,

## JOSE BIAOU,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s).

## NOTICE OF FORFEITURE

The allegations contained in Counts One through Seven of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

Upon conviction of the offense(s) in violation of Title 18, United States Code, Section

1343, as set forth in Counts One through Six of this Indictment, or Title 18, United States Code, Section 641, as set forth in Count Seven of this Indictment, the defendant,

**JOSE BIAOU,**

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(2)(A), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s).

### SPECIFIC PROPERTY SUBJECT TO FORFEITURE

The specific property subject to forfeiture includes, but is not limited to, the following:

1) A 2010 Porsche 997.2 Turbo with Vehicle Identification Number WP0ZZZ99ZA5761202.

### MONEY JUDGMENT

Upon conviction, the United States will seek a money judgment.

### SUBSTITUTE ASSETS

If any of the property described above, as a result of any act or omission of the defendant:

- a. cannot be located upon the exercise of due diligence;
- b. has been transferred or sold to, or deposited with, a third party;
- c. has been placed beyond the jurisdiction of the court;
- d. has been substantially diminished in value; or
- e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and 982(a)(2)(A);   Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p))

A TRUE BILL:

FOREPERSON

*Matthew M. Groves/jph*

Attorney of the United States in
and for the District of Columbia