**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> v. <br><br> **JOSE BIAOU**, <br><br> Defendant. | Case No. 24-cr-323 (CRC) |

**MEMORANDUM OPINION AND ORDER**

Defendant Jose Biaou stands charged with wire fraud and aggravated identity theft based on allegations that he made a series of false statements on multiple Paycheck Protection Program ("PPP") loan and Economic Injury Disaster Loan ("EIDL") applications.  Trial is scheduled to begin on February 9, 2026.  Before the Court are eleven pending motions, including Biaou's motion to dismiss counts, motion to sever counts, motion to suppress evidence, and numerous motions in limine.[1]  Briefing is now complete, and this omnibus Memorandum Opinion & Order resolves the dispositive motions while reserving judgment on certain evidentiary matters until trial is underway.

---

[1] The Court notes that several of Biaou's motions were unexpected.  In June 2025, the Court specifically asked Biaou's recently-engaged counsel whether he "anticipate[d] filing anything more complex or involved than the standard motions in limine," as it would have been preferable to "deal with those things *before* the pretrial motions deadline."  Status Conference Tr. (ECF No. 23) at 3:23–4:1 (emphasis added).  Counsel suggested only that he was "considering" a motion to suppress, so the Court recommended that he "consider filing that [motion] sooner rather than later."  Id. at 4:8, 4:15–16.  Notwithstanding the Court's suggestion, Biaou filed both a motion to dismiss and a motion to suppress less than six hours before the pretrial motions deadline, and two months after the government filed the Superseding Indictment.  While the Court has had sufficient time to consider Biaou's motions, it reminds the parties that dispositive motions are distinct from motions in limine, and should be treated accordingly.  See Graves v. District of Columbia, 850 F. Supp. 2d 6, 10 (D.D.C. 2011) ("Consistent with the historical origins of the practice, motions in *limine* are 'designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions.'" (citation omitted)).

## I.     Background

The following background facts are based on allegations set forth in the Superseding Indictment.  See Superseding Indictment (ECF No. 24).  In 2020, Congress established the PPP program, which offered forgivable loans to small businesses for job retention and certain other expenses incurred during the COVID-19 pandemic.  Id. ¶ 6.  PPP loan applications were processed and funded by participating financial institutions, including JPMorgan Chase & Co. ("JP Morgan") and PNC Bank ("PNC"), and the loans were guaranteed by the Small Business Administration ("SBA").  Id. ¶¶ 4, 8.  The SBA also administered the EIDL program, which predated the COVID-19 pandemic.  Id. ¶ 12.  EIDLs were intended to provide economic relief to businesses experiencing a temporary loss in revenue due to a disaster.  Id.  Unlike PPP loans, EIDLs were processed directly by the SBA and funded by the United States Treasury.  Id.

Biaou was the Chief Executive Officer of FRB Capital Group LLC ("FRB"), a D.C.-based limited liability corporation formed in 2013.  Id. ¶ 2.  As a business, FRB brokered loans between commercial developers and financial institutions or other investors.  Id.  Biaou was also purportedly involved in a separate company named Millenium Global Finance ("MGF").  Id. ¶ 28.  The government alleges that between April 2020 and December 2021, Biaou submitted multiple fraudulent PPP loan and EIDL applications on behalf of FRB and MGF.  See id. ¶¶ 18– 40.

In April 2020, Biaou submitted a PPP loan application on behalf of FRB to JP Morgan for over $225,000.  Id. ¶ 18.  In the application, Biaou claimed that FRB had seven employees and an average monthly payroll of $90,000.  Id. ¶ 19.  In reality, the government submits, FRB had only one full-time employee, two independent contractors, and an average monthly payroll of approximately $11,700.  Id.  In support of the loan application, Biaou allegedly submitted

fraudulent documentation from FRB's payroll service provider.  Id. ¶ 20.  Based on these representations, JP Morgan approved the application and transferred $225,000 in loan proceeds to an account controlled by Biaou.  Id. ¶ 21.

In February 2021, Biaou submitted a second PPP loan application on behalf of FRB, this time seeking $222,500 from PNC.  Id. ¶ 24.  The application stated that FRB had ten employees and an average monthly payroll of $89,900, even though FRB's tax returns indicated that the company had two employees and an average monthly payroll of $8,500.  Id. ¶ 25.  Biaou again submitted purportedly fraudulent documentation from FRB's payroll service provider.  Id. ¶ 26. PNC approved the application and transferred $222,500 to an account under Biaou's control.  Id. ¶ 27.

In March 2021, Biaou submitted a PPP loan application for $1.25 million to PNC Bank on behalf of MGF.  Id. ¶ 28.  The application stated that by February 2020, MGF had employees and/or independent contractors on its payroll.  Id. ¶ 29.  In the government's telling, however, the company had neither employees, nor independent contractors, nor revenue.  Id.  The loan application also claimed that in 2019, the company had 52 employees and an average monthly payroll of over $523,000, even though the company was not in operation at that time.  Id. ¶ 30. The application listed Biaou's father, R.B., as the company's president, but he allegedly "held no such role" at the company.  Id. ¶ 31.  The government further maintains that Biaou signed the application using his father's signature without his father's knowledge or authorization.  Id. PNC again approved the application and transferred $1.25 million into an account controlled by Biaou.  Id. ¶ 33.

In August 2021, Biaou submitted an EIDL application to the SBA, seeking $1,877,600 on behalf of FRB.  Id. ¶ 34.  He claimed that he was a United States citizen (he is not), FRB

employed seven employees in January 2020 (it had one employee), and the company earned

$2.25 million in gross revenue in 2019 (it made $938,000). Id. ¶¶ 35–36.  The SBA approved

the EIDL application and transferred $1,877,500 into an account controlled by Biaou.  Id. ¶ 37.

In December 2021, Biaou attempted to obtain an EIDL for $2 million on behalf of MGF.

Id. ¶ 38.  The loan application stated that the company had 22 employees in January 2020 and 12

employees in December 2021.  Id. ¶ 39.  But, as noted before, the government maintains that the

company only had one employee in January 2020.  Id. ¶ 36.  The SBA rejected the EIDL

application for MGF, and no funds were transferred to Biaou.  Id. ¶ 40.

The following year, Biaou applied for forgiveness of the $225,000 PPP loan that JP

Morgan issued in April 2020.  Id. ¶ 22.  In the loan forgiveness application, according to the

government, Biaou submitted a lease agreement and checks suggesting that FRB's monthly rent

was $13,827.  Id. ¶ 23.  But the government asserts that the documents were fraudulent, and

FRB's actual monthly rent was $10,000 less than what Biaou represented.  Id.

A grand jury initially charged Biaou with six counts of wire fraud and one count of theft

of government property.  See Indictment (ECF No. 1).  After plea negotiations proved

unsuccessful, the government sought and obtained a Superseding Indictment in October 2025.

The Superseding Indictment retains the six counts of wire fraud, but it replaces the count for

theft of government property with aggravated identity theft based on the allegation that Biaou

supplied his father's signature on the March 2021 PPP loan application to PNC.[2]  See

Superseding Indictment (ECF No. 24) ¶¶ 42–43.

---

[2] The six wire fraud counts relate to the PPP loan application to JP Morgan in April 2020
(Count One), the PPP loan application to PNC in February 2021 (Count Two), the PPP
loan application to PNC in March 2021 (Count Three), the EIDL application to the SBA in August
2021 (Count Four), the unsuccessful EIDL application to the SBA in December 2021 (Count

## II.  Pretrial Motions[3]

A.  <u>Biaou's Motion to Dismiss Counts (ECF No. 39)</u>

Biaou first moves to dismiss four counts from the superseding indictment.  <u>See</u> Mot. to Dismiss (ECF No. 39).  A criminal defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  Pretrial motions may challenge "a defect in the indictment," including a "failure to state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(v).  Because pretrial dismissal of an indictment "directly encroaches upon the fundamental role of the grand jury," a motion to dismiss "is granted only in unusual circumstances."  <u>United States v. Ballestas</u>, 795 F.3d 138, 148 (D.C. Cir. 2015) (citation omitted).

An indictment requires only "a plain, concise, and definite written statement of the essential facts constituting the offense charged," Fed. R. Crim. P. 7(c)(1), in order "to inform the defendant of the nature of the accusation against him," <u>Ballestas</u>, 795 F.3d at 148–49 (quoting <u>United States v. Hitt</u>, 249 F.3d 1010, 1016 (D.C. Cir. 2001)).  When evaluating a motion to dismiss, the Court "assumes the truth of those factual allegations."  <u>Id.</u> at 149.  The Court is also "limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes."  <u>United States v. Sunia</u>, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (citation omitted).  At this stage, "[t]he operative question is whether the allegations, if proven, would be

---

Five), and the loan forgiveness application to JP Morgan in December 2022 (Count Six).  <u>See</u> Superseding Indictment (ECF No. 24) at 10 (summary chart).

[3] In addition to the motions enumerated below, the parties filed two motions in January 2026:  The government moved for revocation of Biaou's pretrial release (ECF No. 46), and Biaou cross-moved to dismiss certain counts due to a purported <u>Brady</u> violation (ECF No. 53).  The Court denied both motions following a revocation hearing on January 15, 2026.  <u>See</u> Jan. 15, 2026 Min. Entry.

sufficient to permit a jury to find that the crimes charged were committed."  United States v. Sanford, Ltd., 859 F. Supp. 2d 102, 107 (D.D.C. 2012).

In his motion to dismiss, Biaou claims that the Superseding Indictment (1) fails to state a claim of aggravated identity theft in Count Seven; (2) charges him with conduct in Count One that occurred beyond the five-year statute of limitations; and (3) does not establish that the conduct underlying Counts Three, Four, and Five occurred within the United States' jurisdiction. All three arguments fall short.

### 1. Aggravated Identity Theft

Biaou first contends that Count Seven does not state a claim of aggravated identity theft because his alleged conduct—the unauthorized use of his father's name and signature on a PPP loan application—was not the "crux" of the underlying wire fraud.  Mot. to Dismiss (ECF No. 39) at 5.

The aggravated identity theft statute applies when the defendant, "during and in relation to [wire fraud], knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person."  18 U.S.C. § 1028A(a)(1).  The Supreme Court recently clarified the statute's scope in Dubin v. United States, 599 U.S. 110 (2023).  In that case, a defendant who overbilled Medicaid for psychological testing was convicted under § 1028A because his fraudulent billing included patients' Medicaid reimbursement numbers (i.e., a "means of identification").  Id. at 113–15.  The Court concluded that § 1028A did not apply to his conduct, as his use of the patients' identities "was not at the crux of what made the underlying overbilling fraudulent."  Id. at 132.  In other words, the identity theft was only an "ancillary feature" of the underlying healthcare fraud.  Id.  Accordingly, to be convicted of

aggravated identity theft in relation to wire fraud, "the means of identification specifically must be used *in a manner* that is fraudulent or deceptive."  Id. (emphasis added).

Biaou argues that the same logic applies here:  The fraud underlying the § 1028A charge is his alleged "misrepresentations about the metrics" of MGF in the PPP loan application, not the use of his father's name and signature on the application.  Mot. to Dismiss (ECF No. 39) at 6. But R.B.'s identity is not "ancillary" to the alleged fraud; it is a core feature of it.  Dubin, 599 U.S. at 132.  The government alleges that the PPP loan application was fraudulent *both* because it misstated key information about the company (e.g., whether it had any employees in February 2020) *and* because it falsely suggested that R.B., the company's "president," filed the loan application on MGF's behalf.  Superseding Indictment (ECF No. 24) ¶¶ 29–31.  In other words, the alleged "fraud or deceit" in the loan application relates to "who" was seeking the loan. Dubin, 599 U.S. at 132; see also United States v. Prather, 138 F.4th 963, 970 (6th Cir. 2025) (concluding that a defendant violated § 1028A by using her disabled nephew's identifying information to submit fraudulent EIDL applications); United States v. Carter, No. 21-cr-681 (NSR), 2024 WL 4859155, at *5 (S.D.N.Y. Nov. 21, 2024) (recognizing that identity theft was an "essential part" of the scheme to defraud the SBA because names and social security numbers are "indispensable to EIDL applications").  Thus, the Superseding Indictment properly states a claim of aggravated identity theft.

### 2. *Statute of Limitations*

Biaou next argues that Count One is barred by the statute of limitations.  As both parties acknowledge, the original Indictment was filed within the five-year limitations period for wire fraud.  See 18 U.S.C. § 3282(a) (setting a five-year statute of limitations for non-capital federal offenses); United States v. Howard, 350 F.3d 125, 127 (D.C. Cir. 2003) (noting that wire fraud is

"completed" when the wire is used).  But the government filed the Superseding Indictment on October 30, 2025, more than five years after Biaou submitted the PPP loan application to JP Morgan in April 2020.  Thus, Biaou says, Count One is now untimely.

"For limitations purposes, 'a superseding indictment filed while the original indictment is validly pending relates back to the time of filing of the original indictment if it does not substantially broaden or amend the original charges.'"  United States v. Yielding, 657 F.3d 688, 703 (8th Cir. 2011) (citation omitted)); see United States v. Grady, 544 F.2d 598, 602 (2d Cir. 1976) (noting that a superseding indictment "cannot be barred by the statute of limitations" if it "does not broaden the charges made in the first indictment").  In other words, a superseding indictment relates back to the original indictment's filing date "so long as it neither materially broadens nor substantially amends the charges initially brought against the defendant."  United States v. Ross, 77 F.3d 1525, 1537 (7th Cir. 1996) (collecting cases).

Biaou submits that the Superseding Indictment does not relate back to the filing of the Original Indictment because it (1) added a new charge of aggravated identity theft in Count Seven; and (2) modified some of the details of the wire fraud alleged in Counts Three and Five. See Mot. to Dismiss (ECF No. 39) at 7.  But to determine whether the superseding indictment should relate back to the original indictment, courts look at the specific charges at issue, not the indictment in its entirety.  See, e.g., United States v. Pacheco, 912 F.2d 297, 305 (9th Cir. 1990) ("[W]here the counts of an original indictment are simply duplicated verbatim into a superseding indictment, the statute of limitations *on those counts* is tolled, even if *additional counts* that are subject to no limitations objection are added." (emphasis added)); United States v. Jones, 816 F.2d 1483, 1487 (10th Cir. 1987) (noting that the date of the original indictment controlled because the superseding indictment did not broaden the specific charge at issue); Ross, 77 F.3d

at 1537–38 (examining only whether the superseding indictment broadened or substantially amended the counts that were beyond the limitations period); United States v. Lowry, 409 F. Supp. 2d 732, 739 (W.D. Va. 2006) ("[T]he relevant question is whether specific charges alleged to be time-barred should relate back—not whether the [superseding] indictment should relate back as a whole."). Biaou does not argue that the Superseding Indictment substantially broadened or amended Count One, as the facts underlying the charge are identical to those in the original Indictment. Compare Indictment (ECF No. 1) ¶¶ 18–21 with Superseding Indictment (ECF No. 24) ¶¶ 18–21. Thus, Count One relates back to the date the original Indictment was filed, which is well within the five-year limitations period.[4]

### 3. Extraterritoriality

Finally, Biaou claims that Counts Three, Four, and Five should be dismissed because they relate to conduct that "occurred abroad under the domestic wire fraud statute."[5] Mot. to Dismiss (ECF No. 39) at 8. That is, he contends that those charges are impermissible extraterritorial applications of the wire fraud statute.

"It is a basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the world.'" RJR Nabisco v. Eur. Cmty., 579 U.S. 325, 335 (2016) (quoting Microsoft Corp. v. AT&T Corp., 550 U.S. 437, 454 (2007)). This principle, known as the presumption of extraterritoriality, provides that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic

---

[4] The Court need not address the government's alternative argument that a ten-year limitations period applies to Count One because the underlying fraudulent PPP loan application "affects a financial institution." 18 U.S.C. § 3293(2).

[5] Biaou also asks the Court to dismiss Count Seven because it is "expressly premised on the alleged wire fraud at issue in Count Three." Mot. to Dismiss (ECF No. 39) at 9.

application." <u>Id.</u> Courts review the extraterritorial application of a statute in two steps. <u>Id.</u> at

337. First, the Court must ask "whether the statute gives a clear, affirmative indication that it

applies extraterritorially." <u>Id.</u> If it is not extraterritorial, then courts determine whether the

specific case "involves a domestic application of the statute." <u>Id.</u> While it is "usually . . .

preferable for courts to proceed" in that order, <u>id.</u> at 338 n.5, courts may begin with the second

step "if addressing step one would require resolving 'difficult questions' that do not change 'the

outcome of the case,' but could have far-reaching effects in future cases," <u>WesternGeco LLC v.</u>

<u>ION Geophysical Corp.</u>, 585 U.S. 407, 413 (2018). The Court will exercise that discretion here.

    To determine whether Counts Three, Four, and Five "involve[] a domestic application" of

the wire fraud statute, the Court must identify "the statute's focus and ask[] whether the conduct

relevant to that focus occurred in United States territory." <u>Id.</u> (citation and internal quotation

marks omitted). When examining the "focus" of a statute, the Court must look to "the objec[t] of

the statute's solicitude," which may turn on the "conduct, parties, or interests that it regulates or

protects." <u>Id.</u> at 416 (alteration in original) (citation and internal quotation marks omitted). "If

the conduct relevant to the statute's focus occurred in the United States, then the case involves a

permissible domestic application even if other conduct occurred abroad." <u>RJR Nabisco</u>, 579

U.S. at 337.

    To the Court's knowledge, the D.C. Circuit has not opined on the "focus" of the wire

fraud statute. However, multiple courts of appeals have observed that the proper focus is "the

use of . . . wires in furtherance of a scheme to defraud." <u>Bascuñán v. Elsaca</u>, 927 F.3d 108, 122

(2d Cir. 2019) (emphasis omitted); <u>United States v. Napout</u>, 963 F.3d 163, 179 (2d Cir. 2020);

<u>United States v. McLellan</u>, 959 F.3d 442, 469 (1st Cir. 2020); <u>United States v. Hussain</u>, 972 F.3d

1138, 1145 (9th Cir. 2020); <u>United States v. Elbaz</u>, 52 F.4th 593, 602–04 (4th Cir. 2022); <u>cf.</u>

United States v. Alston, 609 F.2d 531, 536 (D.C. Cir. 1979) (concluding that wire fraud is separately punishable from the D.C. false pretenses statute because the "focus" of the wire fraud statute "is upon the misuse of the instrumentality of communication").  Accordingly, a claim of wire fraud "involves sufficient domestic conduct when (1) the defendant used . . . wires in furtherance of a scheme to defraud, and (2) the use of . . . wires was a core component of the scheme to defraud."  Bascuñán, 927 F.3d at 122.[6]

The Superseding Indictment specifies that the wire signals at issue—that is, the PPP loan and EIDL applications—were sent from the country Benin to PNC Bank (Count Three), from Türkiye to the SBA (Count Four), and from Russia to the SBA (Count Five).[7]  See Superseding Indictment (ECF No. 24) at 10 (summary chart).  As the government correctly notes, transmission of a message in furtherance of a scheme occurs both where it originated *and* where it was received.  Elbaz, 52 F.4th at 604; McLellan, 959 F.3d at 469–70 (indicating that an e-mail sent "to, from, or within the United States" is a "domestic wire"); cf. United States v. Fahnbulleh, 752 F.3d 470, 477 (D.C. Cir. 2014) ("[V]enue for wire fraud lies in any jurisdiction

---

[6] Biaou's extraterritoriality claim relies on United States v. All Assets Held at Bank Julius Baer & Co., Ltd., which held that the focus of the wire fraud statute is "the scheme to defraud," meaning that the defendant must have "commit[ed] a substantial amount of conduct in the United States."  251 F. Supp. 3d 82, 102–03 (D.D.C. 2017).  But that analysis relied on a test provided by Elsevier, Inc. v. Grossman, 199 F. Supp. 3d 768, 784 (S.D.N.Y. 2016), a case predating the Second Circuit's contrary interpretation in Bascuñán, 927 F.3d at 123 ("[W]hile a defendant's location is relevant to whether the regulated conduct was domestic, the mail and wire fraud statutes do not give way simply because the alleged fraudster was located outside the United States.").  Moreover, the rule articulated by All Assets "would effectively immunize offshore fraudsters from . . . wire fraud."  Id.; see also United States v. Jin, No. 23-cr-91 (CKK), 2025 WL 2409749, at *12 (D.D.C. Aug. 19, 2025) (describing the Second Circuit's decision in Bascuñán as "instructive").

[7] Curiously, the government's brief quotes from the original Indictment, not the Superseding Indictment.  Compare Indictment (ECF No. 1) at 10 (noting that the wire signal underlying Count Five originated *in the District of Columbia*) with Superseding Indictment (ECF No. 24) at 10 (noting that the wire signal underlying Count Five originated *in Russia*).

to or from which the communication was transmitted.").  Here, it is undisputed that the recipients

of the wire signals—PNC and the SBA—are based in the United States.  And the wire signals

were clearly a core component of the fraud.  Because Counts Three, Four, and Five are all

"permissible domestic applications" of the wire fraud statute, Elbaz, 52 F.4th at 604, the Court

denies Biaou's motion to dismiss.

    B.  Biaou's Motion to Sever Counts (ECF No. 27)

Biaou also moves to sever the counts related to FRB (i.e., Counts One, Two, Four, and

Six) from the counts related to MGF (i.e., Counts Three, Five, and Seven).  In his view, a single

trial on all counts would unfairly prejudice him because (1) a jury would be more likely to

convict him "on the basis of an improper assumption of criminal propensity," and (2) a single

trial would "hinder defense counsel's practical ability to present different types of defenses to the

jury for different types of charges."  Motion to Sever (ECF No. 27) at 2.

The Federal Rules of Criminal Procedure permit the joinder of two or more offenses in a

single indictment when they "are of the same or similar character, or are based on the same act or

transaction, or are connected with or constitute parts of a common scheme or plan."  Fed. R.

Crim. P. 8(a).  Offenses are of a "similar character" when they are "nearly corresponding,

resembling in many respects, somewhat alike, or having a general likeness to."  United States v.

Wilkins, 538 F. Supp. 3d 49, 87 (D.D.C. 2021) (quoting United States v. Treadwell, 566 F. Supp.

80, 86 (D.D.C. 1983)).  They may also be "connected together" when there is "commonality of

proof."  Id. (citing United States v. Richardson, 161 F.3d 728, 734 (D.C. Cir. 1998)).  Ultimately,

courts are to construe Rule 8 "liberally," and joinder may be permitted "even if the claims are

entirely unrelated to each other."  Id. (quoting United States v. Gooch, 665 F.3d 1318, 1325

(D.C. Cir. 2012)).

If counts are properly joined in a single indictment under Rule 8, Rule 14 governs the subsequent severance of counts.  See Schaffer v. United States, 362 U.S. 511, 515 (1960); United States v. Mack, 53 F. Supp. 3d 179, 190 (D.D.C. 2014).  Under Rule 14, the Court may order separate trials of counts if joinder "appears to prejudice a defendant."  Fed. R. Crim. P. 14(a). That is, severance is proper if there is a "serious risk" that the jury will be unable to make "a reliable judgment about guilt or innocence."  Gooch, 665 F.3d at 1336 (quoting Zafiro v. United States, 506 U.S. 534, 539 (1993)).  The defendant carries the burden of establishing prejudice. United States v. Carson, 455 F.3d 336, 374 (D.C. Cir. 2006).  And even if a defendant establishes prejudice, the Court still retains discretion on whether to sever counts.  Id.; see also Gooch, 665 F.3d at 1336.  "Absent substantial prejudice to the accused, offenses properly joined under Rule 8 should be jointly tried to 'conserve judicial resources, [alleviate] the burdens on citizens serving as jurors, and [to avoid] the necessity of having witnesses reiterate testimony in a series of trials.'"  Treadwell, 566 F. Supp. at 86 (alterations in original) (citation omitted).

Biaou does not meaningfully dispute that the seven counts in the Superseding Indictment are properly joined under Rule 8(a).  See Johnson v. Panetta, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived.").  Instead, he claims that he would be prejudiced under Rule 14 if the counts related to FRB were tried alongside the counts related to MGF.

First, Biaou contends that there are "fundamental differences between the FRB Counts and the MGF Counts," so combining them in a single trial could "suggest[] a propensity for fraud."  Mot. to Sever (ECF No. 27) at 6.  To be sure, severance may be appropriate if there is a risk that "the jury may cumulate evidence of the separate crimes."  Blunt v. United States, 404 F.2d 1283, 1288 (D.C. Cir. 1968).  But in this case, the evidence related to the FRB loan

applications is "separable and distinct" from the evidence related to the MGF loan applications. United States v. Lewis, 626 F.2d 940, 945 (D.C. Cir. 1980). Each wire fraud count relates to a discrete application with its own alleged misrepresentations and supporting documentation. See generally Superseding Indictment ¶¶ 18–40. Indeed, the government anticipates presenting the evidence "in chronological order, application by application." Mem. in Opp'n to Def.'s Mot. to Sever (ECF No. 47) at 8. Because there is little risk that the jury "would confuse or cumulate the evidence against the defendant, draw improper inferences of criminal disposition, or confuse the applicability of the government's evidence or the defendant's defenses" by trying the counts together, Biaou has not established prejudice under Rule 14. Lewis, 626 F.2d at 945; see also Hill v. United States, 418 F.2d 449, 450–51 (D.C. Cir. 1968) (holding that joinder "did not erupt in prejudice to defendant over and above that inherent in all joinder of offenses of common character" because the offenses "were responsibly separated from each other by counsel and by the trial judge").

Second, Biaou claims that joinder would "interfer[e] with his right to present a defense," as "it may very well make sense for [him] to testify in response to the government's allegations in some [c]ounts but not others (among other possible privileged strategic distinctions)." Mot. to Sever (ECF No. 27) at 6–7. Biaou's premise is sound: "In some circumstances prejudice may develop when an accused wishes to testify on one but not the other of two joined offenses." Blunt, 404 F.2d at 1289 (citation and internal quotation marks omitted). But a defendant's "election to testify on some but not all of the charges on trial does not automatically require a severance." Bradley v. United States, 433 F.2d 1113, 1122 (D.C. Cir. 1969) (noting that "[s]uch a rule . . . would divest the court of all control over the matter of severance and entrust it to the defendant" (citation omitted)). Instead, Biaou must provide the Court with enough information

"regarding the nature of the testimony he wishes to give on one count and his reason for not wishing to testify on the other" so that the Court can (1) assess whether "the claim of prejudice is genuine," and (2) "intelligently . . . weigh the considerations of 'economy and expedition in judicial administration' against the defendant's interest in having a free choice with respect to testifying." Blunt, 404 F.2d at 1289 (citation omitted). That is, "no need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other." Baker v. United States, 401 F.2d 958, 977 (D.C. Cir. 1968) (footnote omitted).

Biaou fails to make that showing here. While he hints that it "may very well make sense" for him to testify about the FRB counts and not the MGF counts (or vice versa), he fails to explain *why*. See Motion to Sever (ECF No. 27) at 6–7. Thus, his reasoning for testifying on some counts but not others "remain[s] a mystery." United States v. Delgado, No. 22-cr-304 (JEB), 2023 WL 8354928, at *8 (D.D.C. Dec. 1, 2023); see also United States v. Lewis, No. 24-cr-144 (LLA), 2024 WL 4932043, at *3 (D.D.C. Dec. 2, 2024). Because Biaou "failed to carry [his] burden of showing why the court should exercise its discretion under Rule 14," United States v. Singh, 973 F. Supp. 7, 19 (D.D.C. 1997), the Court denies his motion to sever.

C. Biaou's Motion to Suppress (ECF No. 38)

Biaou next seeks to suppress any evidence obtained from searches of three Microsoft e-mail accounts, two Google e-mail accounts, and his residence.[8] He asserts that the searches were unconstitutional because (1) the warrants lacked sufficient particularity and were overly broad;

---

[8] Biaou's moves for leave to file his motion to suppress under seal because it cited to materials covered by the Court's protective order governing discovery. See Protective Order (ECF No. 10). The Court grants the motion for leave to file under seal, and the following discussion only cites to portions of the sealed filings that are necessary to explain its ruling.

(2) the warrants lacked probable cause; (3) law enforcement agents exceeded their authority by seizing his cell phone; and (4) the agents exceeded their authority by seizing suspected contraband that lacked a "plausible connection" to the alleged wire fraud.[9]  The government retorts that the warrants were sufficiently particular, accounted for all evidence seized, and established probable cause.  The government adds that, in any event, the evidence would be admissible because law enforcement relied on the warrants in good faith.

Law enforcement agents executed searches of the e-mail accounts and Biaou's residence pursuant to three separate warrants.  The warrants for the Microsoft and Google accounts authorized the government to seize information that "constitute[d] fruits, contraband, evidence, and instrumentalities of violation of [wire fraud] as described in the affidavit submitted in support of th[e] Warrant."  Mem. in Opp'n to Mot. to Suppress (ECF No. 54-2) at 2.  The warrant for Biaou's residence in northwest D.C. authorized a search for "fruits, evidence, information, contraband, or instrumentalities . . . relating to violations of [wire fraud and bank fraud] that have been committed [by Biaou] as described in the search warrant affidavit."  Id., Ex. 3 at 5.

The Fourth Amendment requires that search warrants be supported by probable cause and "particularly describe[e] the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The particularity requirement ensures that every government search "will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."  Maryland v. Garrison, 480 U.S. 79, 84 (1987) (footnote omitted).  "[A] warrant with 'indiscriminate sweep' is 'constitutionally

---

[9] Because the government does not intend to introduce evidence obtained from Biaou's cell phone or the suspected contraband, the Court declines to address those claims here. See United States v. Kahre, 737 F.3d 554, 565 (9th Cir. 2013).

intolerable.'"  United States v. Smith, 108 F.4th 872, 878 (D.C. Cir. 2024) (quoting Stanford v.

Texas, 379 U.S. 476, 486 (1965)).  For example, mere reference to a "broad federal statute" does

not place any practical limit on the scope of a warrant or the officers' actions in executing the

warrant.  United States v. Maxwell, 920 F.2d 1028, 1033 (D.C. Cir. 1990) (holding that a search

warrant with no affidavit incorporated and limited only by mere reference to the wire fraud

statute in its description of the items to be seized is "fatally overbroad").  However, a warrant's

incorporation of a corresponding affidavit may satisfy the particularity requirement if "(1) the

affidavit accompanies the warrant, and in addition (2) the warrant uses suitable words of

reference which incorporate the affidavit by reference."  Id. (internal quotation marks omitted)

(quoting United States v. Vaughn, 830 F.2d 1185, 1186 (D.C. Cir. 1987)).

Biaou claims the search warrants were not sufficiently particularized because the

warrants' language was "too generalized" and "cabined only by reference to broad federal

statutes."  Mot. to Suppress (ECF No. 38-2) at 3–4.  But, unlike the deficient warrant in

Maxwell, the warrants in this case are not cabined solely by reference to the federal wire fraud

statute.  In Maxwell, the warrant lacked "explicit words . . . indicating that the magistrate

intended to incorporate the contents of the affidavit into the warrant and thereby limit its scope

by reference to the affidavit."  920 F.2d at 1032.  By contrast, the warrants here incorporate the

affidavits as attachments and expressly reference them as limitations on the government's scope

of search.  See, e.g., Mem. in Opp'n to Mot. to Suppress (ECF No. 54-2), Ex. 2. at 10

(authorizing the seizure of "fruits, contraband, evidence, and instrumentalities of violations of

[the wire fraud statute] *as described in the affidavit* submitted in support of th[e] Warrant"

(emphasis added)).  These "suitable words of reference," demonstrating explicit intent to

incorporate the affidavit into the warrant, sufficiently limit the scope of the warrant and satisfy

the particularity requirement of the Fourth Amendment.  Maxwell, 920 F.2d at 1032; see also

United States v. Thorne, 548 F. Supp. 3d 70, 97 (D.D.C. 2021).

   Biaou next claims that the search warrant for his residence was not supported by probable

cause.[10]  See U.S. Const. amend. IV.  To find probable cause, a magistrate judge must determine

that, based on an objective assessment of the evidence presented in the warrant application, there

is a "fair probability" the government will find evidence of wrongdoing in the location to be

searched.  Illinois v. Gates, 462 U.S. 213, 238 (1983).  The government must also establish a

"nexus . . . between the item to be seized and criminal behavior."  United States v. Griffith, 867

F.3d 1265, 1271 (D.C. Cir. 2017) (alteration in original) (citation omitted).  While a judge may

draw "reasonable inferences" from the material supplied by the government to find probable

cause, an affidavit comprised of "wholly conclusory statement[s]" is insufficient.  Gates, 462

U.S. at 239–40.  When reviewing a magistrate's finding of probable cause, courts assess whether

there was a "substantial basis" for concluding that (1) the government was likely to find evidence

of a crime at the search location, and (2) a nexus existed between the evidence sought and the

criminal act.  Thorne, 548 F. Supp. 3d at 93–94.

   According to Biaou, the affidavit supporting the search warrant for his residence

provided "zero justification" for why any evidence of wire fraud was likely to be found there.

Mot. to Suppress (ECF No. 38-2) at 6.  The Court disagrees.  First, the affidavit established that

Biaou lived at the targeted address through several different methods of identification, including

his B-2 visa re-entry paperwork, records from prior civil litigation brought against him, internet

service subscriber records, and the affiant's own observations.  Second, the affidavit explained

_____

   [10] Biaou does not meaningfully dispute that the search warrants for the Microsoft and
Google e-mail accounts were supported by probable cause.  See Johnson, 953 F. Supp. 2d at 250
(noting that "perfunctory and undeveloped arguments" are waived).

that the PPP loan and EIDL applications were completed using electronic devices "such as laptop computers," and the devices used to complete the applications "would be in the control of the individual completing and benefiting from the applications."  The affiant further explained that these devices were necessary to fabricate supporting documentation for the loan applications, and there was reason to believe that the documents would be saved to any new or updated computers in Biaou's residence.  Thus, the affidavit not only provided rationale for why the items to be seized might reasonably be found at the residence, but also established the necessary "nexus" between the place to be searched and the alleged wire fraud.

Finally, Biaou contends that the affidavits relied too heavily on the affiant's "conclusory" beliefs.  In doing so, however, he takes the so-called conclusory statements from the affidavits out of context.  For example, Biaou cites the affiant's "belief" that a lease agreement included in the loan forgiveness application underlying Count Six was fraudulent.  But the affiant followed this statement with multiple factual justifications as to *why* he believed the documentation was fraudulent.  See, e.g., Mem. in Opp'n to Mot. to Suppress (ECF No. 54-2), Ex. 2. at 15–16 (explaining that the lease agreement included in the loan forgiveness application "differ[ed] significantly" from documentation provided by the real estate company).  Biaou's argument about the conclusory nature of the affidavits is unfounded.  Accordingly, the Court denies Biaou's motion to suppress.

### D.  Biaou's Motion to Compel Production of the "PNC Report" (ECF No. 26)

Biaou next moves to compel the production of a report prepared by PNC that "allegedly initiated the investigation that led to this case."  Mot. to Compel (ECF No. 26) at 2.  He asserts that any such report is Brady material and otherwise discoverable under Rule 16 because it "is material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E)(i).  The government objects to

Biaou's request, but it has provided the defense a detailed "summary letter" containing information pertinent to the request.  The Court will address this issue at the upcoming pre-trial conference.

      E.   Biaou's Motion to Define the Scope of the Prosecution Team (ECF No. 34)

Biaou also requests an order declaring that both the SBA and the Internal Revenue Service's Criminal Investigations Division ("IRS-CI") are part of the "prosecution team" for purposes of the government's discovery obligations, including its duty to search for Brady information.  Mot. to Define Scope of Prosecution Team (ECF No. 34) at 1.  The government concedes that the IRS-CI is part of the prosecution team, but it says there is "no basis to extend the same treatment to [the] SBA."  Resp. to Def. Mot. (ECF No. 59) at 1.

In criminal prosecutions, the government "must comply with two related discovery obligations."  United States v. Trump, 753 F. Supp. 3d 17, 25 (D.D.C. 2024) (footnote omitted). First, the government has a "duty to search" possible sources of Brady information, including evidence from other agencies.  United States v. Brooks, 966 F.2d 1500, 1502 (D.C. Cir. 1992). This duty to search, however, is limited to "files maintained by branches of government 'closely aligned with the prosecution.'"  Id. at 1503 (citation omitted).  The scope of the duty "depends on the 'working relationship' between the prosecution and other agencies, along with 'the nature of the files' at issue, the difficulty of searching for them, and the prospect of finding favorable evidence therein."  Trump, 753 F. Supp. 3d at 25–26 (citing Brooks, 966 F.2d at 1503).

Second, the government is obligated to produce certain documents upon request under Rule 16, including items "within the government's possession, custody, or control" that are "material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E)(i); see United States v. Marshall, 132 F.3d 63, 68 (D.C. Cir. 1998) ("[T]he government cannot be required to disclose

evidence that it neither possesses nor controls.").  To determine what materials are within the government's possession, courts are "more concerned with fairness to the defendant, on the one hand, and the government's ease of access to the documents sought, on the other, than with the issue whether the documents are actually within the physical possession of the prosecutor." United States v. Libby, 429 F. Supp. 2d 1, 5–6 (D.D.C. 2006) (alteration in original) (quoting United States v. Poindexter, 727 F. Supp. 1470, 1477 (D.D.C. 1989)).

Accordingly, courts in this district apply the same "duty to search" standard under both Brady and Rule 16:  "A prosecutor must search for and produce information maintained by other components of the government which are closely aligned with the prosecution."  Trump, 753 F. Supp. 3d at 27 (internal quotation marks omitted) (quoting Libby, 429 F. Supp. 2d at 6); see also Poindexter, 727 F. Supp. at 1477; United States v. Safavian, 233 F.R.D. 12, 14 (D.D.C. 2005). This inquiry is "fact-intensive" and resolved "on a case-by-case basis."  Libby, 429 F. Supp. 2d at 9.

Biaou argues that the SBA is part of the prosecution team because it provided "key evidence" for use at trial.  Mot. to Define Scope of Prosecution Team (ECF No. 34) at 4.  After all, the SBA guaranteed PPP loans and administered the EIDL program.  See Superseding Indictment ¶¶ 8, 12.  The government responds that the test cannot be whether the entity provided "key evidence," as by that logic all third-party lenders—including JP Morgan and PNC here—would be part of the prosecution team.  Resp. to Def. Mot. (ECF No. 59) at 3.  In any event, the government adds, SBA did not provide "key evidence"; while it may have processed the EIDL applications, "the bulk of evidence related to disbursed funds would be in the possession of third-party financial institutions."  Id.

The Court agrees that the SBA is not part of the prosecution team for purposes of the government's <u>Brady</u> or Rule 16 discovery obligations.  When considering whether an agency is "closely aligned" with the government, "there is appreciable distance between an agency that merely complies with a prosecutor's request for a limited, specific set of documents, and an agency that . . . substantially deploys its own personnel and resources to conduct a broad or open-ended search for evidence."  <u>Trump</u>, 753 F. Supp. 3d at 49 (concluding that the Department of Defense's production of documents to the government did not make it part of the prosecution team).  While the SBA may have provided documentation of the EIDL applications to the government, there is no evidence before the Court that it engaged in "extensive cooperation with the [government] in gathering evidence for this case."  <u>United States v. Sturgeon</u>, No. 21-cr-91 (RCL), 2023 WL 3203092, at *4 (D.D.C. May 2, 2023).  Nor is there evidence that the SBA "contributed to the investigation in other ways."  <u>United States v. Sheppard</u>, No. 21-cr-203 (JDB), 2022 WL 17978837, at *11 (D.D.C. Dec. 28, 2022).  In short, an agency that provides a limited number of requested documents cannot be said to be in a "close working relationship" or in "extensive cooperation" with the government.  <u>Trump</u>, 753 F. Supp. 3d at 49 (citations omitted).  Because the IRS-CI is part of the prosecution team and the SBA is not, the Court grants Biaou's motion in part and denies it in part.[11]

F.  <u>Evidentiary Motions</u>

The parties have also filed several motions in limine seeking evidentiary rulings in advance of trial.  The Court has sufficient information to at least address each motion, but as

---

[11] The government represents that "all the discoverable materials pertaining to IRS-CI have already been provided to the defense in compliance with Rule 16 and <u>Brady</u> obligations," and it "acknowledges its ongoing discovery obligations."  Resp. to Mot. to Define Scope of Prosecution Team (ECF No. 59) at 2.

noted below, it will reserve judgment on certain issues until trial is underway.  See Daniels v. District of Columbia, 15 F. Supp. 3d 62, 67 (D.D.C. 2014) (recognizing that courts may defer ruling on motions on limine "until trial [when] decisions can be better informed by the context, foundation, and relevance of the contested evidence within the framework of the trial as a whole" (alteration in original) (citation and internal quotation marks omitted)).

### 1.  Biaou's Motion to Exclude Loan Application Records (ECF No. 32)

Biaou moves to exclude records of the loan applications that he purportedly filed, claiming that they violate the best evidence rule, constitute hearsay, and unfairly prejudice him.

### a.  Best Evidence

Biaou first claims that the government does not possess the "actual" EIDL applications, and admitting "derivative" records of the applications would violate the best evidence rule.[12] Mot. to Exclude Loan Application Records (ECF No. 32-2) at 1, 5.  The best evidence rule provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."  Fed. R. Evid. 1002.  An "original" of electronically-stored information refers to "any printout—or other output readable by sight—if it accurately reflects the information."  Fed. R. Evid. 1001(d).  "The elementary wisdom of the best evidence rule rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description [of the document]."  Gordon v. United States, 344 U.S. 414, 421 (1953).  The rule is thus intended to

---

[12] Biaou's best evidence argument focuses on the EIDL applications submitted to the SBA, not the PPP loan applications submitted to JP Morgan or PNC.  Accordingly, the Court does not address whether "screenshots" of JP Morgan's system of records are admissible "duplicates" under Fed. R. Evid. 1001(e).  See Resp. to Mot. (ECF No. 49) at 6.

both "prevent fraud" and "ensure accuracy."  United States v. Holton, 116 F.3d 1536, 1545 (D.C. Cir. 1997).

During discovery, Biaou asked the government to produce "all documentation submitted or maintained in connection with the loan and forgiveness applications at issue in this case . . . in the form in which they were received and kept by the relevant agency or institution."  Mot. to Exclude Loan Application Records (ECF No. 32-2), Ex. A at 2.  The government provided the following response:

> With respect to the point regarding the format of the applications, because the loan and forgiveness applications were submitted electronically, each copy of an application, regardless of the source, was generated by the respective lender's system of record. . . . For its part, the Economic Injury and Disaster Loan records appear to look more like an Excel spreadsheet or a transcript – that is the format in which the government receives them in every COVID fraud case because that is how the agency's system of record generates the information into a reader-friendly version.

Id., Ex. B at 4.

The government's briefing provides additional context about the records in question. When the SBA began accepting EIDL applications in March 2020, its system "was so flooded and overwhelmed that it crashed, necessitating a system upgrade."  Resp. to Mot. (ECF No. 49) at 2.  So later that month, the Office of Management and Budget approved the use of an "EIDL RAPID Intake Form," a streamlined application that could be completed online.  Id. at 3.  This new application form was "a combination of the previously approved SBA application forms 3501, 3502, 3053, and 3504."  Id. (footnote omitted).  The government alleges that Biaou used the RAPID Intake Form to submit the two EIDL applications at issue in Counts Four and Five. Id. at 6.  So during discovery, the government produced records that it says "accurately reflect the SBA's electronically stored information" of his responses, and it intends to introduce this evidence through the testimony of an SBA employee.  Id. at 2, 4.  In the government's view, the

EIDL application records constitute "originals" under Rule 1001—and thus satisfy the best evidence rule—because they are "printout[s]" or "other output[s]" which accurately reflect the information submitted on the RAPID Intake Forms.  Id. at 5 (quoting Fed. R. Evid. 1001(d)).

In rebuttal, Biaou questions whether the records "accurately reflect" the EIDL applications.  See Reply in Supp. of Mot. (ECF No. 58) at 1–2.  From his perspective, the records are "inaccurate representations" of the "the SBA loan forms (Forms 3501, 3502, and 3503)" that he allegedly filled out.  Id. at 2; see also Mot. to Exclude Loan Application Records (ECF No. 32-2) at 6 (asserting that SBA regulations "required applicants to fill out SBA Forms 3501, 3502, and 3503" (footnote omitted)).

Ultimately, Biaou's best evidence claim hinges on a question of fact: whether Biaou submitted the relevant EIDL applications using the RAPID Intake Form, or whether he used SBA Forms 3501, 3502, and 3503.  See Fed. R. Evid. 104(a) (providing that the Court decides preliminary questions about whether evidence is admissible).  If the government establishes through witness testimony (or the parties ultimately stipulate) that the former is true, then the records likely constitute "originals" under Rule 1001.  If not, then Biaou's best evidence argument becomes more persuasive.[13]  Accordingly, the Court denies Biaou's motion to exclude the loan application records under the best evidence rule, but he is free to renew his objection if the government fails to lay a proper foundation.

---

[13] Notwithstanding Biaou's skepticism, the evidence currently before the Court indicates that the SBA *did* use the RAPID Intake Form to receive EIDL Applications.  After all, the header for the records at issue is "Rapid Intake Form Data Lookup."  See Mot. to Exclude Loan Application Records (ECF No. 32-2), Ex. C; id., Ex. D.

b. Hearsay

Biaou also claims that the loan application records contain two layers of hearsay:  The first is the information provided by the applicant to the lender, and the second is the lender's assertion that the applicant did in fact provide that information.  See Mot. to Exclude Loan Application Records (ECF No. 32-2) at 10. ("[T]hese records effectively contain statements that 'the government asked Mr. Biaou for his number of employees' and in response 'Mr. Biaou said' a particular number. Those statements would be offered for their truth—that those exact statements of the lender or government, and Mr. Biaou, were in fact made.").  This argument falls short.  As both parties agree, the first layer—the assertions made in the applications— consists of statements by an opposing party, which is "not hearsay."  See Fed. R. Evid. 801(d)(2)(A).  And the second layer—the assertion that Biaou in fact provided this information—would not be an out-of-court statement.  See Fed. R. Evid. 801(c).  Instead, the government intends to call witnesses who can (1) establish the accuracy of the SBA's records, and (2) show using IP addresses and other evidence that Biaou submitted the loan applications at issue.  See Resp. to Mot. (ECF No. 49) at 2–4.  Because these witnesses are subject to cross examination, Biaou will have ample opportunity to "challenge the assertion that particular words or numbers were communicated between the [lenders] and the defendant."  Mot. to Exclude Loan Application Records (ECF No. 32-2) at 11.

c. Unfair Prejudice

Finally, Biaou submits that the loan records should be excluded because their probative value is substantially outweighed by a danger of unfair prejudice to him.  See Fed. R. Evid. 403.  He notes that the answers contained in the spreadsheets do not align with the questions provided on the SBA Forms.  Mot. to Exclude Loan Application Records (ECF No. 32-2) at 7–9

(comparing the spreadsheets to SBA Form 3501).  Thus, he says, the government should not be allowed to introduce spreadsheets that "do not accurately reflect what he was asked and how he responded."  Reply in Supp. of Mot. (ECF No. 58) at 3.

Here too, Biaou's argument depends on whether he used the RAPID Intake Form or SBA Forms 3501, 3502, and 3503 to complete the EIDL applications.  If he used the RAPID Intake Form, then it would make sense why his answers did not align with the outdated SBA Forms. See Mot. to Exclude Loan Application Records (ECF No. 32-2) at 8 (noting that the spreadsheets "suggest that Mr. Biaou answered an entirely different question" than what was asked on SBA Form 3501).  Accordingly, the Court denies Biaou's motion under Rule 403, but as explained above, he is free to renew his objection if the government fails to lay a proper foundation as to which application form was in use during the relevant time period.[14]

### 2. Government's Motion to Admit IP Address Information (ECF No. 33)

Next, the government moves the Court to take judicial notice of publicly-available Internet Protocol ("IP") address information contained on the Internet Corporation for Assigned Names and Numbers ("ICANN") database.  Among other things, the government intends to use the IP address records as circumstantial evidence that Biaou—not his father—submitted the PPP loan application at issue in Counts Three and Seven.  See Mot. to Admit Printout of ICANN's IP Address Information (ECF No. 33) at 2–3.

---

[14] The Court appreciates Biaou's concern that, regardless of which application forms were in effect, the spreadsheets that the government intends to use at trial "do not reflect what Mr. Biaou actually saw—including form application guidance, instructions, or the information actually solicited."  Reply in Supp. of Mot. (ECF No. 58) at 3.  For that reason, on cross examination Biaou may wish to show the jury a version of the RAPID Intake Form as it would appear to an applicant completing the form online, should the government elect not to do so in the first instance.

"Any device connected to the Internet is identified by a unique Internet Protocol ('IP') address, consisting of a series of numbers separated by periods." Stern v. Islamic Republic of Iran, 73 F. Supp. 3d 46, 48 (D.D.C. 2014). An IP address "identifies the location, '*i.e.*, a particular computer-to-network connection' of an end-user's computer and also 'serves as the routing address for . . . requests to view a web page.'" Weinstein v. Islamic Republic of Iran, 831 F.3d 470, 473 (D.C. Cir. 2016) (alteration in original) (citation omitted), abrogated on other grounds by Rubin v. Islamic Republic of Iran, 583 U.S. 202 (2018). As a result, an IP address "is critical to the Internet's functioning in the same way a telephone number is essential to the functioning of the telecommunications system." Id.

ICANN is a non-profit public benefit corporation that "performs several functions essential to the functioning of the internet," including the distribution of IP addresses. Id. at 476; see also Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 395 (2d Cir. 2004). After generating IP addresses, ICANN distributes them downstream to regional Internet registries and ultimately to end-users. Weinstein, 831 F.3d at 476–77. ICANN also maintains the "Whois" database, a "public resource that allows a user to retrieve information about IP number resources, organizations, [points of contact], customers, and other entities." United States v. Bychak, 441 F. Supp. 3d 1003, 1008 (S.D. Cal. 2020) (alteration in original) (citation omitted). In this case, law enforcement agents utilized the Whois database to obtain the location of IP addresses used to access Biaou and R.B.'s e-mail accounts. Mot. to Admit Printout of ICANN's IP Address Information (ECF No. 33) at 3. For example, records from the database appear to reveal that an IP address located in Benin logged in to the e-mail account associated with R.B. Id. at 4.

The government seeks to admit the ICANN records as evidence of where various IP addresses were located. Id. at 5–6. It submits that the Court may take judicial notice of the

ICANN records, or in the alternative, admit the records under Fed. R. Evid. 803(17). Biaou objects to the admission of the records, claiming that they are irrelevant and not "sufficiently reliable" to warrant judicial notice. Mem. in Opp'n to Gov't Mot. (ECF No. 57) at 3–5.

The Court declines the government's invitation to "take judicial notice of various search queries regarding IP addresses within the ICANN database" at this time. Mot. to Admit Printout of ICANN's IP Address Information (ECF No. 33) at 8. To be sure, the Court may judicially notice a fact that "is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(a)(2). But in this case, it is unclear what "fact" warrants judicial notice. Is it the fact that the records were obtained from the Whois database? The fact that the records are accurate? Or the fact that the IP addresses in question are associated with a particular geographic location? The government simply asks the Court to "take judicial notice of various search queries," but without further clarification, the Court is in no position to do so. See Fed. R. Evid. 201(c)(2) (noting that the Court must take judicial notice only if it is "supplied with the necessary information").[15]

That said, the Court also concludes that the records are likely admissible. The Federal Rules of Evidence provide an exception to the rule against hearsay for "[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations." Fed. R. Evid. 803(17). These records are considered trustworthy because of the "general reliance by the public or by a particular segment of it," as well as the

---

[15] The Court also notes that even if the Court took judicial notice of the ICANN records, the jury would be free to accept or reject the Court's conclusion. See Fed. R. Evid. 201(f); United States v. Perez, 150 F.4th 237, 248 (4th Cir. 2025) ("An adjudicative fact is . . . the kind of factual issue ordinarily decided by a jury.")

"motivation of the compiler to foster reliance by being accurate." Fed. R. Evid. 803, advisory comm. note (1972). As the government correctly notes, multiple courts have found that records from the Whois database fall within Rule 803(17)'s ambit. See, e.g., Dish Network LLC v. Fraifer, No. 16-cv-2549 (CPT), 2023 WL 8622142, at *9 (M.D. Fla. Aug. 31, 2023) (noting that Whois records are "of the kind regularly relied upon to establish the identity of registrants"), report and recommendation adopted, 2024 WL 51035 (M.D. Fla. Jan. 4, 2024); EarthLink, Inc. v. Ahdoot, No. 03-cv-2559 (JOF), 2005 WL 8154298, at *8 (N.D. Ga. Feb. 1, 2005) (holding that Whois search results fall under Rule 803(17)). Based on the government's representations about ICANN's history and purpose, the Court will likely conclude that the Whois database records are "generally relied on by the public." Fed. R. Evid. 803(17). However, the Court will reserve judgment on this issue until the government lays the proper foundation at trial.

Biaou's objection to the IP address evidence on relevance and Rule 403 grounds is unlikely to succeed. In short, Biaou points out that the IP address records in question are from 2023, even though the alleged wire fraud occurred between 2020 and 2022.[16] See Mem. in Opp'n to Gov't Mot. (ECF No. 57) at 3–4. Because the records are from "a period entirely disconnected from the charged conduct," he claims that their probative value (if any) is "far outweighed" by the risk of unfair prejudice. Id. (citing Fed. R. Evid. 403). However, evidence is relevant if "it has *any tendency* to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401 (emphasis added); see United States v. Foster, 986 F.2d 541, 545 (D.C. Cir. 1993) ("The general

---

[16] To be clear, Biaou's objection appears to be directed at IP address records obtained from Microsoft and Google, not ICANN. Compare Mot. to Admit Printout of ICANN's IP Address Information (ECF No. 33) at 2–3 (describing records subpoenaed from Microsoft and Google) with id. at 4–6 (describing search results from the Whois database).

rule is that relevant evidence is admissible.").  If evidence is relevant, it may only be excluded under Rule 403 "if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.  In this context, "unfair prejudice" refers to an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." United States v. Ring, 706 F.3d 460, 472 (D.C. Cir. 2013) (citation omitted).  The IP address records present no such risk.  The government intends to use the 2023 records as evidence that Biaou had access to the e-mail account used to submit the PPP loan application underlying Counts Three and Seven.  This evidence, while circumstantial, easily clears the low bar for relevance, and Biaou is free to attack the government's chain of inferences at trial.

In sum, the Court denies the government's motion to take judicial notice of the ICANN records, but the government may still attempt to enter the evidence after laying the proper foundation.

### 3. Biaou's Motion to Exclude Reference to Misdemeanor Offenses (ECF No. 36)

Biaou also moves to exclude any evidence or argument regarding his prior misdemeanor and traffic offenses.  In his view, evidence of these offenses—including the "nolle diversion" disposition of a simple assault charge—has "no bearing on any issue in this case" and carries a risk of unfair prejudice.  See Mot. to Exclude (ECF No. 36) at 1–2.  The government does not intend to introduce evidence of Biaou's prior traffic offenses, but it argues that evidence of his assault charge is relevant because Biaou addressed the offense in the PPP loan application underlying Count Two.

The Superseding Indictment alleges that in February 2021, Biaou submitted a fraudulent PPP loan application to PNC on behalf of FRB.  See Superseding Indictment ¶ 24.  The following day, PNC sent a message to the e-mail address provided on the application, requesting

proof "that the borrower . . . doe[es] not have a criminal record and/or provide information and documentation explaining the criminal record."  Resp. to Def.'s Mot. (ECF No. 50) at 2 (alterations in original).  In response, Biaou submitted a signed letter explaining that he was charged with simple assault in March 2019, but a "nolle diversion" was entered in October 2019. Id. at 3.  He expressed his belief that the disposition "does not affect eligibility for a PPP loan," and he attached the relevant paperwork from the D.C. Superior Court.  Id.

The government submits that Biaou's signed letter and corresponding paperwork are "highly relevant" because it shows that Biaou—rather than a third party—submitted the PPP loan application to PNC.  Id.  In other words, the government does not intend to use Biaou's response as "propensity" evidence under Rule 404, see United States v. Lawson, 410 F.3d 735, 741 (D.C. Cir. 2005) (noting that "prior bad acts" are admissible so long as they are not offered only to show conformity), or as "impeachment" evidence under Rule 609, see United States v. Benton, 98 F.4th 1119, 1128 (D.C. Cir. 2024) (explaining that Rule 609 "covers admission of a criminal conviction to impeach a witness").  Instead, the evidence advances the government's theory that Biaou personally submitted the allegedly fraudulent PPP loan application. Accordingly, the prejudicial effect of that evidence (if any) does not substantially outweigh its probative value.  Cf. United States v. Mosquera-Murillo, 153 F. Supp. 3d 130, 185 (D.D.C. 2015) (concluding that the risk of prejudice is lessened when the conduct at issue "did not result in prosecution or conviction" and "generally involve[d] criminal activity that is no more serious than that charged in the indictment"), aff'd, 902 F.3d 285 (D.C. Cir. 2018).  At Biaou's request, the Court will consider redacting the reference to the specific charge in the letter and/or issuing a limiting instruction to ensure that the jury considers the evidence for its proper purpose.  See United States v. Moore, 75 F. Supp. 3d 444, 453 (D.D.C. 2014).

The Court therefore grants Biaou's motion to exclude any reference to any traffic offenses, but denies his motion to exclude evidence of the aforementioned correspondence with PNC.[17]

### 4. Biaou's Motion to Exclude Evidence of Personal Property (ECF No. 37)

Biaou moves to exclude evidence that he owned certain vehicles—including a Porsche—along with other "lifestyle" evidence. Mot. to Exclude Unfairly Prejudicial Evidence (ECF No. 37) at 1. He contends that this evidence is not relevant carries an "acute risk" of unfair prejudice. Id. at 4.

As alleged in the Superseding Indictment, Biaou received over $2 million in PPP loan and EIDL funds between April 2020 and August 2021. See Superseding Indictment at 10 (summary chart). PPP loans were to be used "for certain permissible expenses, including payroll costs, interest on mortgages, rent, and utilities," id. ¶ 9, and later for worker protection costs, uninsured property damage costs, and certain operation expenses, id. ¶ 10. Similarly, EIDL funds were dispersed "solely as working capital to alleviate economic injury caused by disaster." Id. ¶¶ 13–14 (defining working capital to include "payroll expenses, sick leave, production costs, and ordinary business obligations"). The government submits that Biaou did not use the PPP loan and EIDL funds for "the inflated or nonexistent payroll figures" provided in the loan applications, but rather "funneled the funds" to accounts under his control, which he later used to buy other things, including a Porsche. Resp. to Mot. (ECF No. 55) at 4.

---

[17] The Court may reconsider its ruling on Biaou's traffic offenses if he "opens the door" to cross examination about his criminal history. See, e.g., United States v. McGill, 815 F.3d 846, 906 (D.C. Cir. 2016) (noting that a defendant may open the door to impeachment about the details of his convictions "by attempting to minimize his misconduct in his testimony" (citation and internal quotation marks omitted)).

Biaou first objects that evidence related to his purchase of the Porsche is not relevant because (1) he was not charged with making false statements about his *use* of the PPP loan and EIDL funds at issue, and (2) the government has not traced the loan proceeds to the purchase of the Porsche.  Mot. to Exclude Unfairly Prejudicial Evidence (ECF No. 37) at 2–4.  Recall that the bar for relevance is low:  The evidence in question need only have "any tendency" to make a fact of consequence more or less probable.  Fed. R. Evid. 401.  And here, evidence that Biaou used PPP loan and EIDL funds to purchase a luxury vehicle makes it more likely that he intended to defraud the COVID-19 relief programs.  See, e.g., United States v. Booth, 309 F.3d 566, 575 (9th Cir. 2002) (recognizing that the improper use of funds is circumstantial evidence of an intent to defraud); United States v. Cole, 631 F.3d 146, 155–56 (4th Cir. 2011) (admitting evidence of "lavish spending" as probative of the defendant's motive to accumulate and maintain wealth).  The Court's conclusion, however, is premised on the assumption that the funds used to purchase the Porsche can be traced to the PPP loan or EIDL proceeds.  See Fed. R. Evid. 104(b).  So assuming for now that the government can lay the proper foundation, the Court will deny Biaou's motion under Rule 402 and defer ruling on the admissibility of the evidence until trial.  See Barnes v. District of Columbia, 924 F. Supp. 2d 74, 79 (D.D.C. 2013) (acknowledging the Court's discretion to "await developments at trial" before issuing an evidentiary ruling (citation omitted)).

Biaou also objects to the evidence under Rule 403 because it "invites potential class prejudice" and leads to the improper inference that "because Mr. Biaou owned nice things, he must have obtained them dishonestly."  Mot. to Exclude Unfairly Prejudicial Evidence (ECF No. 37) at 4–5.  The Court is unconvinced.  Rule 403 does not bar prejudicial evidence; it bars evidence for which the risk of "unfair prejudice" substantially outweighs its probative value.

Fed. R. Evid. 403; United States v. Gartmon, 146 F.3d 1015, 1021 (D.C. Cir. 1998). The evidence that Biaou used the loan proceeds for his personal benefit would not "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997). Nor would it be "offered on an ancillary issue or to inflame the jury." Gartmon, 146 F.3d at 1021. Instead, the government intends to offer the purchase "as evidence of [the] defendant's intent and controlling role in the fraud." Id. Accordingly, the Court denies Biaou's motion under Rule 403 too.

> 5. *Government's Amended Motion to Admit 404(b) Evidence (ECF No. 40)*

The government next moves for admission of "intrinsic evidence" and "other acts evidence" under Federal Rule of Evidence 404(b).

The government's motion cites seven categories of evidence that it may offer at trial, which the Court briefly summarizes here. First, the government has obtained evidence that in January 2021, Biaou unsuccessfully applied for two additional PPP loans from JP Morgan on behalf of FRB. Am. Mot. to Admit Intrinsic and Rule 404(b) Evid. (ECF No. 40) at 14–17. Those applications—which are not charged in the Superseding Indictment—were rejected because Biaou did not provide sufficient evidence of his payroll expenses. Id. at 16. Second, the government seeks to admit evidence that in April 2020, Biaou used his ex-wife's name without authorization to apply for a loan repayment program. Id. at 17. Third, the government may elect to present evidence that Biaou forged his father's signature on an unsuccessful loan application (unrelated to the PPP or EIDL programs) in April 2023. Id. at 18–19. Fourth, the government has evidence that Biaou attempted to obtain a $50,000 bank loan using false and/or altered supporting documentation. Id. at 19–21. Fifth, the government submits that Biaou altered the expiration date on his driver's license to substantiate a wire transfer request. Id. at 21–22. Sixth,

the government has learned that Biaou submitted false bank statements to Catholic University in his attempt to renew his F-1 student visa.  Id. at 23–25.  And seventh, the government seeks to admit evidence that Biaou falsified bank statements and a "reference letter" from Bank-Fund Staff Federal Credit Union.  Id. at 26–34.

Before considering whether this evidence is admissible under Rule 404(b), the Court must first determine whether the conduct is "intrinsic" to the charged offenses.  See United States v. McGill, 815 F.3d 846, 879 (D.C. Cir. 2016).  That's because acts "extrinsic" to the charged crimes are subject to Rule 404(b), while acts "intrinsic" to the offenses are not.  Id. (citing United States v. Bowie, 232 F.3d 923, 927 (D.C. Cir. 2000)).  An act is intrinsic if it is "part of the charged offense" or an "uncharged act[] performed contemporaneously with the charged crime [that] facilitate[s] the commission of the charged crime."  Bowie, 232 F.3d at 929; see also United States v. Alexander, 331 F.3d 116, 126 (D.C. Cir. 2003) (recognizing that conduct is "intrinsic" if it is "direct evidence of a fact in issue").  By contrast, acts are not intrinsic simply because they "explain the circumstances," "complete the story," or are "tangentially related to the charged crime."  Bowie, 232 F.3d at 928–29; see United States v. Roberson, 581 F. Supp. 3d 65, 71 (D.D.C. 2022).  Put another way, evidence is intrinsic—and thus not subject to Rule 404(b)—if it is "charged in [the] superseding indictment" or "occurred contemporaneously and *to further* the charged offenses."  United States v. Wilkins, 538 F. Supp. 3d 49, 70 (D.D.C. 2021) (emphasis added).

If the government seeks to admit "extrinsic" evidence, the Court turns to Rule 404(b). Under that rule, evidence of any crime, wrong, or other act "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but it "may be admissible for another purpose, such as proving motive, opportunity,

intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b).  While the former phrase is "framed restrictively, the rule itself is quite permissive."  Bowie, 232 F.3d at 929 (citation and internal quotation marks omitted) (describing Rule 404(b) as "a rule of inclusion rather than exclusion").  That is, "other acts" evidence may be introduced for "*any* purpose" as long as "the evidence is not offered *solely* to prove character." United States v. Miller, 895 F.2d 1431, 1436 (D.C. Cir. 1990).

The application of Rule 404(b) follows a "two-step mode of analysis."  United States v. Anderson, 174 F. Supp. 3d 494, 496 (D.D.C. 2016) (quoting United States v. Burch, 156 F.3d 1315, 1323 (D.C. Cir. 1998)).  The first step requires "a determination of whether the evidence is probative of some issue other than character."  United States v. Cassell, 292 F.3d 788, 792 (D.C. Cir. 2002).  That is, the evidence must be relevant, relate to something other than the defendant's character or propensity, and support a finding that the defendant committed the other act.  Id.  In the second step, the Court asks "whether the probative value [of the evidence] is substantially outweighed by the prejudice."  Burch, 156 F.3d at 1323 (citation omitted); see Huddleston v. United States, 485 U.S. 681, 688 (1988) ("If offered for . . . a proper purpose [under Rule 404(b)], the evidence is subject only to general strictures limiting admissibility such as Rules 402 and 403.").

Evidence of the defendant's knowledge, motive, and the absence of mistake may be "relevant to show his specific intent to defraud."  United States v. Brown, 597 F.3d 399, 404 (D.C. Cir. 2010).  If the government intends to use extrinsic evidence to prove intent or the absence of mistake, then the acts must be "closely related to the offense[s] and tend to rebut the defense of mistake."  United States v. DeLoach, 654 F.2d 763, 769 (D.C. Cir. 1980); see also United States v. Long, 328 F.3d 655, 661 (D.C. Cir. 2003) ("What matters is that the evidence be

relevant 'to show a pattern of operation that would suggest intent' and that tends to undermine the defendant's innocent explanation." (citation omitted)).  The government may admit extrinsic evidence in its case-in-chief "in anticipation that a defendant will deny intent or knowledge." United States v. Williams, 507 F. Supp. 3d 181, 190 (D.D.C. 2020).

a.  Unsuccessful PPP Loan Applications to JP Morgan

The government first contends that evidence of Biaou's uncharged, unsuccessful PPP loan applications is intrinsic—and thus not subject to Rule 404(b)—because it is "part and parcel of the charged fraud scheme."  Am. Mot. to Admit Intrinsic and Rule 404(b) Evid. (ECF No. 40) at 38.  It supports this claim by citing to several out-of-circuit cases in which courts admitted evidence of uncharged PPP loan and EIDL applications.  See id.  But the D.C. Circuit has expressed its "dissatisfaction" with the "extrinsic-intrinsic distinction" commonly used by other circuits.  Alexander, 331 F.3d at 125 (citing Bowie, 232 F.3d at 927–29).  Instead, our circuit has adopted a "very narrow understanding of what counts as an 'intrinsic' act."  Roberson, 581 F. Supp. 3d at 71; see also United States v. Edwards, 889 F. Supp. 2d 47, 49 (D.D.C. 2012) (recognizing that the D.C. Circuit "reject[ed] the approach adopted by other Circuits defining 'inextricably intertwined' evidence as that which 'completes the story' of the charged offense").  For that reason, the government's citations to out-of-circuit precedent are largely inapposite.

However, the Court concludes that even if Biaou's unsuccessful PPP loan applications to JP Morgan are "extrinsic" to the charged conduct, they are still admissible under Rule 404(b).  The government notes that in the first application, Biaou sought $250,000 and stated that FRB's average monthly payroll was $90,000.  Am. Mot. to Admit Intrinsic and Rule 404(b) Evid. (ECF No. 40) at 14–15.  JP Morgan denied the application because it "implausibly showed that the 'average monthly payroll included compensation per employee in excess of $100K.'"  Id. at 14.

The bank then denied the second application for a $225,000 PPP loan because it could not verify FRB's average monthly payroll.  Id. at 16.  But less than a month later, Biaou successfully obtained a $222,500 PPP loan from PNC Bank after claiming that FRB had an average monthly payroll of $89,900 instead of $90,000.  Id.; Superseding Indictment ¶¶ 24–27.  The changes to each subsequent application—including the decreases to the loan request and average monthly payroll—provide at least circumstantial evidence that the figures provided in the loan application underlying Count Two are fraudulent.  Because these unsuccessful PPP loan applications are evidence of Biaou's intent and absence of mistake, and their probative value outweighs any prejudicial effect, they are admissible under Rule 404(b).

### b.  Other Extrinsic Evidence

The admissibility of the remaining "other acts" evidence is a closer call.  In short, the government intends to introduce evidence of other occasions—unrelated to the PPP loan or EIDL programs—in which Biaou allegedly falsified identification documents and bank statements.  These categories of evidence are quite similar to the "other acts" evidence presented in Brown.  In that case, the defendant was charged with bank fraud and passing fictitious financial instruments after he attempted to deposit a fraudulent "bill of exchange" into his account at a credit union.  Brown, 597 F.3d at 400.  In addition to testimony about the bills of exchange, the district court allowed testimony about "other occasions when [the defendant] used fictitious financial documents in attempts to obtain something of value."  Id. at 402.  For example, the jury heard testimony that shortly before the charged conduct took place, the defendant attempted to purchase three cars using "registered" drafts, which later proved non-negotiable and subsequently bounced.  Id. at 402–03.  On appeal, the defendant argued that the evidence about his other fraudulent activity should have been excluded under Rule 404(b).  The

D.C. Circuit rejected this argument, concluding that "[e]vidence of [his] intent, as demonstrated by extrinsic evidence of his knowledge, motive, and the absence of mistake or accident, was relevant to show his specific intent to defraud."  Id. at 404; see also id. at 407 ("Extrinsic evidence to show [the defendant's] intent was key to the government's ability to meet its burden of proof that [the defendant] acted with specific intent to defraud.").  The court cited (1) the temporal proximity between the charged offenses and the "other acts" evidence, and (2) the fact that, like the bills of exchange, the fictitious "registered" drafts were "sufficiently authentic in appearance to fool a lay person."  Id. at 404–05.  Because the extrinsic evidence was used for a permissible purpose under Rule 404(b) and not otherwise barred by Rule 403, the court affirmed the defendant's conviction.  Id. at 408.

Like in Brown, the extrinsic evidence that the government seeks to introduce at trial is temporally and substantively related to the charged conduct.  But unlike in Brown, the Court has received no clear indication that Biaou will pursue a "good faith" defense to the wire fraud charges against him.  See id. at 402 (noting that the defendant "indicated during the course of the charged offenses that he was acting in good faith").  Indeed, Brown rejected the defendant's argument that extensive testimony about extrinsic evidence was needlessly cumulative *because* he brought a "good faith" defense at trial.  See id. at 408.  Moreover, at least two cases cited by the government suggest that this form of extrinsic evidence is admissible when it becomes clear that the defense will raise a "lack of intent" or "good faith" defense.  See, e.g., United States v. Estabrook, 774 F.2d 284, 289 (8th Cir. 1985) ("[W]here it is made clear at the outset of the trial that the defendant's principal defense is a lack of knowledge or intent, and thus the issue is unarguably in dispute, the government may take the defendant at his word and introduce [Rule 404(b)] evidence in its case-in-chief."); United States v. Hooton, 662 F.2d 628, 635 (9th Cir.

1981) (allowing Rule 404(b) evidence because "it was obvious that [the defendant] would raise lack of intent as a defense"); but see United States v. Lewis, 759 F.2d 1316, 1349 n.14 (8th Cir. 1985) (noting that the government "may anticipate" a lack-of-intent defense and introduce Rule 404(b) evidence in its case-in-chief). At this point, the Court is unaware of Biaou's defense. But should he indicate that he intends to raise a "good faith" defense to at least some of the wire fraud charges, the Court will likely conclude that at least some of the proffered extrinsic evidence is admissible under Rule 404(b) and Rule 403. But for now, it is premature to do so.

Accordingly, the Court grants the government's motion to admit evidence of the unsuccessful PPP loan applications to JP Morgan in January 2022, and it will reserve judgment on whether the remaining extrinsic evidence is admissible under Rule 404(b) and Rule 403.

### 6. *Government's Motion to Allow Cross Examination of Biaou (ECF No. 31)*

Finally, the government asks the Court to permit cross examination of Biaou—if he chooses to testify—regarding specific instances of conduct that occurred in December 2025. Specifically, the government intends to cross examine Biaou about his violation of his pretrial release conditions. Mot. Regarding Certain Evidence (ECF No. 31) at 1.

The Court previously addressed the events underlying the government's motion during the January 2026 revocation hearing. In short, Biaou's release conditions required him to "stay away / have no contact with any potential witnesses, including his father." Order Setting Conditions of Release (ECF No. 7) at 2. But in December 2025, without the knowledge of his counsel, Biaou appears to have arranged for a notary public to notarize a set of affidavits signed by R.B. Mot. Regarding Certain Evidence (ECF No. 31) at 3–4. The affidavits directly contradicted R.B.'s prior statements to the government and "retracted large swathes of his prior grand jury testimony." Id. at 2–3. Biaou asked the notary to send copies of the affidavits

directly to his counsel, and he paid her over $300 for her services.  Id. at 5–6.  Insisting that

Biaou violated his conditions of release and likely engaged in witness tampering, the government

moved for revocation of his release.  The Court agreed that Biaou clearly violated the no-contact

order, but it elected to modify his conditions of release rather than order pretrial detention.  See

Jan. 15, 2026 Min. Entry; Jan. 15, 2026 Min. Order.

The government now seeks permission to cross examine Biaou about his conduct, should

he choose to testify, because it is "directly probative of [his] character for untruthfulness."  Mot.

Regarding Certain Evidence (ECF No. 31) at 8.  The Federal Rules of Evidence provide that a

party may inquire about "specific instances of a witness's conduct" on cross examination if they

are "probative of the character for truthfulness or untruthfulness of . . . the witness."  Fed. R.

Evid. 608(b); see United States v. Whitmore, 359 F.3d 609, 618 (D.C. Cir. 2004).  To determine

whether conduct is probative of untruthfulness, the Court "is guided by several factors, including

whether the instances of prior untruthfulness bore some similarity to the conduct at issue,

whether or not they were remote in time, whether they were cumulative of other evidence, and

whether there was some likelihood they happened."  United States v. Miller, 738 F.3d 361, 376

(D.C. Cir. 2013) (citation omitted).

These factors indicate that Biaou's apparent attempt to secure exculpatory affidavits from

his father falls within the scope of Rule 608(b).  To be sure, violations of pretrial release

conditions are not always probative of a witness's character for truthfulness.  See United States

v. Morrow, No. 04-cr-355 (CKK), 2005 WL 3163801, at *4 (D.D.C. June 2, 2005).  A witness

who once missed curfew by a few minutes, for instance, is not necessarily untruthful.  But see

United States v. Elwell, 515 F. App'x 155, 162 (3d Cir. 2013) (concluding that a witness's

"willingness to disregard a signed [bail order] arguably demonstrates his character for

untruthfulness, which provides a basis for admissibility under Rule 608"). But in this case, it is the *manner* in which Biaou violated his pretrial release conditions that is probative of his character for untruthfulness. For example, Biaou told the notary that his sister was "helping [R.B.] coordinate" the affidavits, even though Biaou himself was shown to be making the necessary arrangements. Mot. Regarding Certain Evidence (ECF No. 31) at 4. He also asked the notary to send the affidavits *directly* to his counsel (rather than delivering them himself), as if to disguise his involvement in their procurement. Id. at 6. The Court already found by clear and convincing evidence that Biaou violated the conditions of his release, and his conduct is neither remote in time nor cumulative of other evidence. See Miller, 738 F.3d at 376 (noting that the "probativeness" of the Rule 608(b) inquiry may be "diluted both by its remoteness in time and by the fact that that cross-examination would have been based on accusations, not a prior judicial finding" (citation omitted)). Accordingly, the Court grants the government's motion to allow cross examination into Biaou's violation of his release conditions, should he choose to testify.[18]

---

[18] While Rule 608(b) allows for inquiry on cross examination, the government may not "resort to extrinsic evidence of specific instances of misconduct in order to attack [Biaou's] character for truthfulness." McGill, 815 F.3d at 907.

### III.  Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [27] Defendant's Motion to Sever Counts is DENIED.  It is further

**ORDERED** that [31] Government's Motion in Limine Regarding Federal Rule of Evidence 608 is GRANTED.  It is further

**ORDERED** that [32] Defendant's Motion for Leave to File Document Under Seal is GRANTED.  It is further

**ORDERED** that [32-2] Defendant's Motion to Exclude Loan Application Records is DENIED.  It is further

**ORDERED** that [33] Government's Motion in Limine Regarding Admission of IP Address-Information is DENIED.  It is further

**ORDERED** that [34] Defendant's Motion for Order that IRS-CI and SBA are Part of the Prosecution Team is GRANTED in part and DENIED in part.  It is further

**ORDERED** that [36] Defendant's Motion to Exclude Any Reference to Misdemeanor and Traffic Offenses is GRANTED in part and DENIED in part.  It is further

**ORDERED** that [37] Defendant's Motion in Limine to Exclude Unfairly Prejudicial Evidence is DENIED.  It is further

**ORDERED** that [38] Defendant's Motion for Leave to File Document Under Seal is GRANTED.  It is further

**ORDERED** that [38-2] Defendant's Motion to Suppress is DENIED.  It is further

**ORDERED** that [39] Defendant's Motion to Dismiss Counts from Superseding Indictment is DENIED.  It is further

**ORDERED** that [40] Government's Motion in Limine to Admit Intrinsic and 404(b) Evidence is GRANTED in part and DENIED in part.  It is further

**ORDERED** that [54] Government's Motion for Leave to File Document Under Seal is GRANTED.  It is further

**ORDERED** that [60] Government's Motion for Leave to File Document Under Seal is GRANTED.  It is further

**ORDERED** that [68] Government's Motion for Leave to File Document Under Seal is GRANTED.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>January 28, 2026</u>